# In the United States Court of Federal Claims

<table>
<tr><td>

MARIA STROUP, *et. al.*,

        *Plaintiffs*,

v.

THE UNITED STATES,

        *Defendant*.

</td><td>

No. 25-1431
(Filed: March 17, 2026)

</td></tr>
</table>

*David Ricksecker*, McGillivary Steele Elkin LLP, Washington, DC, for Plaintiff.

*Laurel Don Havens, III*, Civil Division, U.S. Department of Justice, Washington, DC for Defendant.

**OPINION AND ORDER**

**LERNER,** *Judge*.

Maria Stroup and her 347 co-plaintiffs are correctional officers at the Federal Correctional Complex in Victorville, CA ("FCC Victorville"). Compl. ¶ 1, ECF No. 1. Plaintiffs allege they perform certain pre-shift and post-shift activities that should be compensated with overtime pay under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*. *Id.* ¶¶ 8, 46. Plaintiffs assert that before and after their eight-hour shifts, they perform compensable work, including undergoing security screening, donning and doffing equipment, and walking through the sally port. *Id.* ¶¶ 21–24; 26–32.

Plaintiffs filed their Complaint on August 26, 2025. *Id.* Defendant filed a Partial Motion to Dismiss on December 18, 2025, arguing that Plaintiffs failed to assert a claim that undergoing security screenings and walking through a sally port are compensable. Def.'s Mot. to Dismiss at 1, ECF No. 12 ("Mot."). For the following reasons, the Court finds that Plaintiffs have sufficiently alleged that time spent in security screenings and the sally port are compensable under the FLSA. Accordingly, Defendant's Partial Motion to Dismiss is **DENIED**.

## I.     Background

### A.     Factual Background

FCC Victorville is composed of three correctional sites: the U.S. Penitentiary Victorville; Federal Correctional Institution, Victorville, Medium I; and Federal Correctional Institution, Victorville, Medium II. Compl. ¶ 9. Each facility houses thousands of male inmates convicted of federal offenses. *Id.* ¶ 10. FCC Victorville staffs all sites twenty-four hours each day, with

most posts staffed for either sixteen or twenty-four hours.  *Id.* ¶ 12–13.  For the twenty-four-hour posts, correctional officers are assigned to consecutive eight-hour shifts.  *Id.* ¶ 14.  These shifts never overlap.  *Id.* ¶ 32.  Plaintiffs allege FCC Victorville requires them "to be on their assigned posts, in uniform and with all assigned equipment and pertinent post information, by the scheduled start of their paid shift," and remain at their post until they are relieved by the next officer.  *Id.* ¶ 15.  Pre- and post-shift work is substantially the same at all FCC Victorville locations.  *Id.* ¶ 25.

According to the Complaint, the correctional officers do not receive compensation for any work performed before or after their eight-hour shift.  *Id.* ¶ 17.  Plaintiffs allege they begin pre-shift work when they clear the staff screening site in the front lobby, and the officers receive an inspection for any contraband or weapons on their person.  *Id.* ¶ 21.  The officers claim they are performing their principal activity of maintaining safety and security while clearing the site.  *Id.*  The screenings are required and are impossible to eliminate without impairing Plaintiffs' ability to complete their work.  *Id.*

After clearing the staff screening site, security officers then don their duty belts, metal chains and chits, and other equipment.  *Id.* ¶ 22.  Plaintiffs note that they cannot receive and don their equipment prior to clearing the screening site because it would set off the metal detectors.  *Id.*  Plaintiffs emphasize that after passing through the security clearance, they, "at all times, are in uniform and identifiable to the inmates and staff as correctional officers, and remain vigilant, alert, and ready to (and do) respond to emergencies."  *Id.* ¶ 23.

Correctional officers then enter the FCC Victorville Control Center sally port and "flip their accountability chit signifying that they are on duty."  *Id.* ¶ 24.  A sally port is "a secure entryway . . . that consists of a series of doors or gates."  Mot. at 13.  While in the sally port, Plaintiffs are locked inside the prison.  Compl. ¶ 24.  As the officers walk from the sally port to their assigned posts, Plaintiffs allege they perform their principal activities by "supervising and monitoring inmates, observing and correcting inmate behavior, responding to inmate questions, checking for security breaches . . . , searching for contraband, running to locations where body alarms sound, responding to orders from supervisors, and responding to other emergencies as they arise."  *Id.* ¶ 26.

When the officers arrive at their posts, they perform equipment inspections and information exchanges with the outgoing officer.  *Id.* ¶ 28.  The officers inspect and exchange "radios, oleoresin capsicum ("OC") spray, keys, handcuffs, and batons."  *Id.*  In addition, the two officers discuss any security events that occurred on the prior shift and any other important information the next officer needs to know.  *Id.*  Plaintiffs emphasize that even though both officers engage in the information and equipment exchange, only the outgoing officer is paid for this activity.  *Id.* ¶ 32.

Ultimately, Plaintiffs allege these activities amount to at least 15–30 minutes of additional work performed during each shift for which they should be compensated with overtime pay.  *Id.* ¶ 17.

### B.    Procedural History

On August 26, 2025, Ms. Stroup filed suit.  Compl.  Opt-in consent forms from 347 similarly situated officers were filed on September 2, 2025 and October 1, 2025.  ECF Nos. 4, 8. On December 18, 2025, Defendant moved to dismiss portions of the Complaint for failure to state a claim under Rule 12(b)(6) of the Court of Federal Claims ("RCFC").  Mot. at 1. Specifically, the Government moves to dismiss the claims for time spent clearing the security screening and passing through the sally port.  *Id.*  Defendant argues that these two activities are not compensable because they are neither "principal activit[ies]" of the officers' employment nor "integral and indispensable" to their principal activities.  *Id.* at 2.  Defendant is not seeking dismissal of claims relating to donning and doffing equipment at this time.  Pls.' Resp. to Mot. ("Resp.") at 6, ECF No. 13.

Plaintiffs' opposition was filed January 9, 2026.  *Id.*  They respond that they sufficiently allege security screenings and sally port walks are principal activities or intrinsically tied to their principal duties.  *Id.* at 9–18.  Plaintiffs additionally argue the sally port walk is compensable because it occurs after their principal duties have begun and is, therefore, part of their "continuous workday."  *Id.* at 18–23.  In its Reply, Defendant contends the continuous workday rule does not apply to federal employees.  Def.'s Reply in Supp. of Mot. ("Reply") at 15–16, ECF No. 16.

Defendant's fully briefed Motion is ripe for review.

## II.    Legal Standards

### A.    Jurisdiction and Motion to Dismiss

The Tucker Act grants the Court of Federal Claims jurisdiction to review claims against the United States founded upon money-mandating statutes.  28 U.S.C. § 1491(a)(1); *Martinez v. United States*, 333 F.3d 1295, 1302–03 (Fed. Cir. 2003).  The FLSA "is a money-mandating source of law," and therefore this Court has jurisdiction over Plaintiffs' claims.  *Burby v. United States*, 167 Fed. Cl. 294, 298 (2023); *see Abbey v. United States*, 745 F.3d 1363, 1369 (Fed. Cir. 2014).

Defendant moves to partially dismiss Plaintiffs' Complaint under RCFC 12(b)(6) for failure to state a claim.  Mot. at 1.  "A motion to dismiss for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the plaintiff do not entitle [them] to a legal remedy."  *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327–28 (Fed. Cir. 2006) (quoting *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir. 2000)).  At the motion to dismiss stage, the Court "accept[s] as true factual allegations in the [Plaintiffs'] complaint and all reasonable inferences that can be drawn from them, and . . . construe[s] them in the light most favorable to the nonmovant."  *Celgene Corp. v. Mylan Pharms, Inc.*, 17 F.4th 1111, 1128 (Fed. Cir. 2021).  Then, the Court must determine whether the Complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

3

"[T]he requirement for a claim to have 'facial plausibility' is not akin to a 'probability requirement'; rather, the plausibility standard 'asks for more than a sheer possibility that a defendant has acted unlawfully.'" *PAE Aviation & Tech. Servs., LLC v. United States*, 155 Fed. Cl. 658, 661 (2021) (quoting *Iqbal*, 556 U.S. at 678).

### B. The FLSA and the Portal-to-Portal Act

The FLSA mandates employers to compensate employees at "a rate not less than one and one-half times the regular rate" for work performed in excess of a forty-hour work week, or more than eight hours a day. 29 U.S.C. § 207(a)(1); *see* 5 C.F.R. § 551.501(a) (applying generally to federal employees). In 1947, Congress enacted the Portal-to-Portal Act to amend the FLSA and carve out exceptions to the FLSA's overtime provisions. 29 U.S.C. §§ 251–62. The Portal-to-Portal Act excludes the following from overtime pay:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

> (2) activities which are preliminary to or postliminary to said principal activity or activities,

> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

*Id.* § 254(a).

The FLSA does not define what constitutes "work." 29 C.F.R. § 785.6; *see also IBP, Inc. v. Alvarez*, 546 U.S. 21, 25 (2005) ("Neither 'work' nor 'workweek' is defined in [the FLSA]."). The Portal-to-Portal Act limits compensable work under the FLSA to employees' time spent performing their "principal activities." 29 U.S.C. § 254(a). But even under the Portal-to-Portal Act, activities performed before or after the regular workday must be compensated if the activities are "an integral and indispensable part of the principal activities." *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956). An activity is integral and indispensable to the principal activities "if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 33 (2014). The inquiry does not focus on "whether an employer *required* a particular activity," but rather whether the activity is "tied to the productive work that the employee is *employed to perform*." *Id.* at 36.

In addition, employees cannot recover for uncompensated overtime if the amount of time is *de minimis*, meaning "preliminary or postliminary work that would otherwise be compensable because it is closely related to principal activities will nonetheless be treated as non-compensable if it totals less than 10 minutes per day." *Bull v. United States*, 68 Fed. Cl. 212, 226 (2005) (citation modified), *decision clarified*, 68 Fed. Cl. 276 (2005), *aff'd*, 479 F.3d 1365 (Fed. Cir. 2007); 5 C.F.R. § 551.412(a)(1).

Congress delegated administration of the FLSA to the Department of Labor ("DOL") for non-federal employees and to the Office of Personnel Management ("OPM") for federal employees. 29 U.S.C. §§ 204(a), (f); *Doe No. 1 v. United States*, 129 F.4th 1362, 1364 (Fed. Cir. 2025) (citations omitted). While the agencies' regulations are typically read in harmony, the FLSA "broadly grants OPM rulemaking authority that is neither subject to nor limited by DOL regulations." *Id.* at 1366 (citing 29 U.S.C. § 204(f)). "OPM regulations are valid if they are consistent with the FLSA and implement a legitimate policy choice." *Id.*

## III.   Discussion

### A.   Plaintiffs Sufficiently Describe their Principal Activities.

The OPM has interpreted principal activities under the FLSA as the "activities that an employee is employed to perform." 5 C.F.R. § 550.112. Plaintiffs describe their principal activity as "maintaining the safety and security of [FCC Victorville], inmates, and staff," which sufficiently captures their primary duty as correctional officers. Compl. ¶ 12.

Defendant contends that "maintaining safety and security" is impermissibly broad. Reply at 4–5. Defendant states this definition of "principal activities" "blur[s] the line between 'ingress' activities and the 'actual work of consequence performed for an employer.'" *Id.* (quoting *Integrity Staffing Sols., Inc.*, 574 U.S. at 38 (Sotomayor, J., concurring)). However, courts have consistently and repeatedly found that "maintaining security" sufficiently describes a correctional officer's principal duty at the motion-to-dismiss stage. *See, e.g.*, *Baytos v. United States*, No. 21-1085, 2022 WL 598742, at *5 (Fed. Cl. Feb. 28, 2022) ("*Baytos I*") (finding that "[p]roviding 'security' . . . is a sufficient description" of correctional officers' principal activity at the motion-to-dismiss stage); *Adegbite v. United States*, 156 Fed. Cl. 495, 505 (2021), *abrogated on other grounds by* 54 F.4th 703, 708 (Fed. Cir. 2022); *see also Aguilar v. Mgmt. & Training Corp.*, 948 F.3d 1270, 1278 (10th Cir. 2020) (affirming summary judgment for officers because "the officers' principal duties include 'searching for contraband and providing security.'" (citation omitted)).[1] Here, Plaintiffs have plausibly alleged that maintaining security is their "actual work of consequence." *Integrity Staffing Sols.*, 574 U.S. at 38 (Sotomayor, J., concurring)).

Defendant also asserts that "maintaining security" is merely the "aspirational goal of the principal activities that plaintiffs are employed to perform." Mot. at 8. Nevertheless, a principal activity can also describe principal duties in the aggregate and include the numerous activities they are employed to perform. *Alkire v. United States*, 158 Fed. Cl. 380, 390 (2022) (finding for

---

[1] Plaintiffs filed a Notice of Supplemental Authority on March 16, 2026, citing *Hodge v. North Carolina Dep't of Adult Correction*, No. 5:19-CV-478-BO, 2026 WL 579933 (E.D.N.C. Mar. 2, 2026). ECF No. 18. *Hodge* granted partial summary judgment in favor of correctional officers' FLSA overtime claims, finding that "maintain[ing] the safety and security of offenders and others" constitutes officers' principal activity. *Hodge*, 2026 WL 579933 at *2. While not binding, the finding is consistent with this Court's conclusion.

security officers, "[m]aintaining safety and security can readily be interpreted as an activity (or collection of activities), not just as a purpose" on a motion to dismiss (citation modified)). Further, "an [officer] may . . . be engaged in several 'principal' activities during the workday." 29 C.F.R. § 790.8(a). It is plausible that "maintaining security" is one of them.

> **B.** **The Complaint offers plausible allegations that Plaintiffs' pre- and post-shift work should be categorized as either principal activities or indispensable and integral to those activities.**

>> **1.** **Plaintiffs sufficiently allege undergoing security screening amounts to compensable work.**

Plaintiffs assert that security screening is part of their principal activity of maintaining security or, at the very least, is integral and indispensable to that activity. Resp. at 12–18. The officers allege that when they enter the prison premises before their scheduled shift, they must undergo a security screening. Compl. ¶ 21. They emphasize the indispensability of this task, stating, "it is an essential contraband check and a mandatory process for all staff that is the only way to ensure a contraband-free environment." Resp. at 13.

Defendant argues that undergoing security screenings should not be considered compensable under the FLSA and moves to dismiss this claim. Mot. at 7–13. Defendant first asserts the screening could be done from home and that "[i]f FCC Victorville did not conduct security screening[s] and trusted the [P]laintiffs to police themselves to not bring any contraband into the prison, [P]laintiffs could still perform the principal activities they are employed to perform." *Id.* at 9. However, Plaintiffs contend that the officers are not seeking compensation for any past self-screenings, only the pre-shift screening in the front lobby of the prison that must be done to ensure they do not inadvertently bring in contraband. Resp. at 14; *see also* Compl. ¶ 21 ("Defendant cannot eliminate the [in-person] screenings altogether without impairing the Plaintiff's ability to complete their work because they could not guarantee a contraband-free environment."). Further, Defendant's arguments rely on fact-finding and cannot be resolved at this stage.

Defendant also asserts that Plaintiffs' claims fail in the aftermath of *Integrity Staffing Solutions*, but that case differs significantly from the facts in the instant matter. Mot. at 11–12. *Integrity Staffing Solutions* found post-shift security screenings for stolen products were neither integral nor indispensable to the work of Amazon warehouse workers, and the screenings were therefore non-compensable activities. 574 U.S. at 35. The Court emphasized that compensability under the FLSA is not an inquiry into whether an employer required a particular activity, but whether it is "tied to the productive work that the employee is employed to perform." *Id.* at 36 (citation omitted). Defendant also cites *Integrity Staffing Solutions* to cast doubt on whether activities that are "essentially part of the ingress and egress process" can amount to essential work. Mot. at 8 (quoting *Integrity Staffing Sols.*, 574 U.S. at 38 (Sotomayor, J., concurring)). For the workers in *Integrity Staffing Solutions*, security screenings were not "an intrinsic element of retrieving products from warehouse shelves or packaging them for shipment." *Integrity Staffing Sols.*, 574 U.S. at 35 (majority opinion).

Here, in contrast, correctional officers have a principal activity of ensuring safety and security, and security screenings are integral to this purpose. Plaintiffs rely on *Alexander v. United States*, 156 Fed. Cl. 512 (2021), which denied a motion to dismiss finding "there is a clear distinction between what is integral and indispensable for warehouse workers, and what is integral and indispensable for prison guards, for whom activities related to the safety of the inmates and staff depend, in part, on proper screening." Resp. at 16 (quoting *Alexander*, 156 Fed. Cl. at 525); *see also Baytos I*, 2022 WL 598742, at *7 (ruling the plaintiffs' "specific duties in this case are much more closely aligned with the security screenings at issue here and *Integrity Staffing* does not compel dismissal"). While the employer in *Integrity Staffing Solutions* could "eliminate[] the screenings altogether without impairing the employees' ability to complete their work," Plaintiffs plausibly allege FCC Victorville cannot eliminate the officers' security screenings with the same effect. *Integrity Staffing Sols., Inc.*, 574 U.S. at 35.

In denying similar dispositive motions, courts have recognized the specialized role of security workers. *See Aguilar*, 948 F.3d at 1278 ("[K]eeping weapons and other contraband out of the prison is necessarily 'tied to' the officers' work of providing prison security and searching for contraband. Indeed, the security screening and the officers' work share the same purpose." (citation omitted)); *Alvarez v. United States*, No. 20-1533, 2021 WL 6163405, at *6 (Fed. Cl. Dec. 30, 2021) (on a motion to dismiss, finding security screenings to be "not as far removed" from correctional officers' alleged principal activities as those in *Integrity Staffing*); *Baytos I*, 2022 WL 598742, at *7 (finding security checkpoint passings are plausibly integral to correctional officers' work). *But see Aitken v. United States*, 162 Fed. Cl. 356, 365 (2022) ("*Aitken I*") (partially denying summary judgment and finding security screenings too distinct from the correctional officers' functions).

Further, even passive activities can be considered compensable work when they constitute tasks the person is employed to perform. *See Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944) ("[A]n employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen."); *Skidmore v. Swift & Co.*, 323 U.S. 134, 136 (1944) ("[W]e cannot[] lay down a legal formula to resolve cases so varied in their facts as are the many situations in which employment involves waiting time."); *see also Montoya v. CRST Expedited, Inc.*, 88 F.4th 309, 319 (1st Cir. 2023) (affirming summary judgment for compensating drivers for time spent in the sleeper berth during traveling under the FLSA). Plaintiffs have stated a plausible claim that the principal activities they are employed to perform encompass security screenings.

### 2. Plaintiffs sufficiently allege the FLSA entitles them to compensation for passing through the sally port.

Defendant also moves to dismiss Plaintiffs' claim related to time spent passing through the FCC Victorville sally ports. Mot. at 13–15. At the motion to dismiss stage, Plaintiffs have also sufficiently pled this claim.

As detailed above, after FCC Victorville officers pass through security and don their equipment, they enter the facilities' sally port where they must flip their accountability chit to

7

signal that they are "on duty."  Compl. ¶ 24.  Plaintiffs argue they perform compensable work when they pass through the sally port.  Resp. at 23.  During this period, certain officers obtain crew kits with equipment for their work.  *Id.* at 25; Compl. ¶ 24.  Plaintiffs emphasize they are on duty, wear their uniform, and must respond to emergencies as they arise while in the sally port.  Resp. at 23–26.  These allegations contradict Defendant's statement that "Plaintiffs . . . make no allegations that they perform security related work while walking through the sally port."  Mot. at 15.

The officers' description of the activities they perform while in the sally port sufficiently support the allegation that passing through the sally port is, at least, integral and indispensable to their principal activity of "maintaining security."  These activities include being in uniform and available to respond to emergencies as they arise, which reflect the principal duties of a correctional officer.  *Baytos I*, 2022 WL 598742, at *8; *see also Hootselle v. Mo. Dep't of Corr.*, 624 S.W.3d 123, 142 (Mo. 2021) (finding "although [state prison guards] are not at their posts, they are required to do the work they are employed to do—specifically, supervising offenders and, when the need arises, intervening in fights or responding to other incidents (i.e., guarding and disciplining offenders)").

Further, Plaintiffs are in a uniquely dangerous position in the sally port.  In *Adegbite*, the court distinguished the time prison officers spend in the sally port to similar claims by Pentagon officers that were dismissed.  156 Fed. Cl. at 508 (citing *Whalen v. United States*, 93 Fed. Cl. 579, 600–01 (2010)).  *Adegbite* denied a motion to dismiss, finding that although "remaining vigilant while guarding the Pentagon is clearly of vital importance, it is not the same thing as remaining vigilant while walking through a prison where the people Plaintiffs are guarding may attack them."  *Id.*  Here, Plaintiffs plead plausible facts that, if supported by a developed record, could show passing through the sally port is integral to their employment.

Accordingly, Plaintiffs have sufficiently alleged the time spent passing through the sally port is compensable under the FLSA.

> **C.**    **Plaintiffs plausibly allege that walking through the sally port is compensable under the "continuous workday" rule.**

Plaintiffs additionally assert a "continuous workday" argument: even if passing through the sally port was not found to be integral and indispensable to their principal activities, the walking time is nevertheless compensable as part of their continuous workday.  Compl. ¶ 22–23; Resp. at 20–21.  While they sufficiently allege that this walk constitutes an integral and indispensable activity, see supra Sections III.A–B, Plaintiffs may also pursue relief based on the continuous workday rule because this rule necessitates a case-by-case fact determination not appropriate at the motion to dismiss stage.

The Portal-to-Portal Act excludes certain non-compensable activities, but only when they "occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities."  29 U.S.C. § 254(a)(2).  Courts have interpreted this portion of the statute to mean

that activities which would otherwise be excluded from the FLSA by the Portal-to-Portal Act could be compensable if they occur during the employees' "workday." *See, e.g.*, *Alvarez*, 546 U.S. at 28–29.  The Supreme Court refers to this as the "continuous workday rule." *Id.* However, OPM Regulation 5 C.F.R. § 551.412(b) ("Section 551.412(b)") states, "[t]ime spent in preliminary or postliminary activities is excluded from hours of work and is not compensable, even if it occurs between periods of activity that are compensable as hours of work."

Defendant argues that under Section 551.412(b), "time spent in a sally port is not compensable even if a compensable activity precedes it."  Reply at 14 (citing *Alkire*, 158 Fed. Cl. at 396).  But Defendant's reasoning is inconsistent; it asserts both that "the continuous workday rule does not apply to [federal] agency employees" and that it does apply, but not "in the same way that it applies to other workers from the private sector."  *Compare* Mot. at 15 (first quoting *Baytos v. United States*, 175 Fed. Cl. 360, 369 (2025) ("*Baytos II*"); and then citing *Aitken v. United States*, 172 Fed. Cl. 377, 408 (2024) ("*Aitken II*")) *with* Reply at 14 (first citing *Aitken I*, 162 Fed. Cl. at 363–64; then citing *Alkire*, 158 Fed. Cl. at 396; and then citing *Baytos II*, 175 Fed. Cl. at 368–69).

These inconsistencies are understandable—the application of the continuous workday doctrine to federal employees requires a nuanced analysis based on case-specific facts.  *Compare Baytos II*, 175 Fed. Cl. at 369 (finding at the summary-judgment stage, "the continuous workday rule does not apply to agency employees"), *with Alkire*, 158 Fed. Cl. at 396 (denying dismissal of continuous workday claim by federal employees because OPM regulations may apply differently depending on factual record).  Indeed, broad, bright-line rules are difficult to apply given the need for close and careful examination of the underlying facts.

For the purpose of the instant Motion to Dismiss, the Court applies the facts as alleged by Plaintiffs to the several questions that must be answered: (1) whether the continuous workday rule applies to federal employees; (2) if so, what definition of "continuous workday" applies to federal employees; and (3) whether Plaintiffs' walk through a sally port (as alleged in the Complaint) would be compensable under that definition.

### 1.    The continuous workday rule applies to federal employees.

Federal employees' "[t]ravel during a 'continuous workday'" *must* also be compensated under the FLSA."  *Bridges v. United States*, 54 F.4th 703, 706–07 (Fed. Cir. 2022) (emphasis added) (citing *Alvarez*, 546 U.S. at 37).  In *Bridges*, the Federal Circuit affirmed summary judgment for the Government and ruled federal correctional officers could not recover overtime pay for time driving from regularly scheduled prison shifts to voluntary overtime hospital shifts that the officers accepted on a case-by-case basis.  *Id.* at 704–05.  Rejecting the need to read OPM's definition of "continuous workday" in conflict with DOL's, the appeals court ruled that neither agency need compensate appellants for this drive because their "travel between shifts does not occur during a 'continuous workday' as defined by both OPM and DOL."  *Id.* at 708.

Defendant argues that because *Bridges* denied compensation to federal correctional officers under a continuous workday theory, the case "is consistent with the inapplicability of the

continuous workday rule" to federal employees.  Reply at 15.  This argument ignores the Federal Circuit's explicit statement, quoted above, that the rule is generally applicable to federal workers.  *See Bridges*, 54 F.4th at 706–07 (citation omitted).

Defendant also inflates the relatively narrow holding in *Bridges* beyond its factual context.  The travel time appellants sought compensation for in *Bridges* is substantially different than a walk through a sally port.  Appellants in *Bridges* finished an eight-hour regular prison shift, then drove twenty minutes to a different and entirely voluntary eight-hour hospital shift that started an hour after the end of the previous shift.  *See* 54 F.4th at 704–05.  The Federal Circuit held that while activities "book-ended" by principal activities typically fall within a compensable "block" of time, certain non-principal activities *may* disrupt this block:

> Appellants' two-shift 'workday,' as they think of it, need not be a 'continuous workday,' legally.  Indeed, § 551.412(b) explicitly contemplates what amounts to noncontinuous workdays: it recognizes that two blocks of 'compensable . . . hours of work,' like those book-ended by principal activities, *may* nonetheless be separated by a noncompensable activity.

*Id*. at 707 (emphasis added) (quoting 5 C.F.R. § 551.412(b)).

Defendant twists the "may" into a "must."  While acknowledging the regulation only "contemplates" that principal activities "may" be separated by noncompensable activities, Defendant nonetheless argues that walking interrupts the continuous workday simply because it is not a principal activity.  *See* Reply at 14, 16.  Taken to its logical extreme, Defendant's reasoning results in a contradictory definition of "continuous workday": one that begins and ends with each individual principal activity.  Thus, five principal activities separated by non-principal activities, no matter how trivial, would transform into five *discontinuous* workdays.

But the holding in *Bridges* is narrower: "the officers' travel *between shifts* does not occur during a 'continuous workday' as defined by both OPM and DOL."  54 F.4th at 708.  That is, travel to a new shift at a different geographic location entirely ends one legal workday and begins another.  This is because "time spent traveling to and from the actual place of performance of the principal activities is not covered by the FLSA, and the officers failed to provide any kind of limiting principle that distinguishes the necessity of the travel at issue in this case from the general necessity of commuting."  *Id.* at 708 (citation modified).

*Bridges* is factually inapposite to the allegations in the instant case, where FCC Victorville officers have a single shift, arrive at their only job site, and must proceed through several pre-shift activities as they travel to their post.  Compl. ¶ 24.  Defendant does not explain why the ruling in *Bridges* requires a holding that walking between principal activities at the same work site should end one legal workday and start another.

Other courts have interpreted *Bridges* differently.  *See Aitken II*, 172 Fed. Cl. at 408 (citing *Bridges*, 54 F.4th at 707) (holding that while walking through a sally port presents different facts than *Bridges*, "the reasoning is no less applicable").  In a post-trial ruling in the Government's favor, *Aitken II* analogized a pre-shift sally-port walk to the drive in *Bridges*

because the "activities at issue are outside Plaintiffs' scheduled shifts. Thus, if any of those activities are not independently compensable as principal activities, they do not become compensable merely because they are 'book-ended by principal activities.'" *Id.* (quoting *Bridges*, 54 F.4th at 707).

But the legal workday for federal employees is defined by the "start and stop of 'principal activities,'" not by the written shift schedule. *Bridges*, 54 F.4th at 707; *see also Alvarez*, 546 U.S. at 34 ("Indeed, [the employer] has not offered any support for the unlikely proposition that Congress intended to create an intermediate category of activities that would be sufficiently 'principal' to be compensable, but not sufficiently principal to commence the workday."). *Bridges* did not exclude the appellants' driving time from the continuous workday solely because they were federal employees and the travel was outside the bounds of an eight-hour shift, but because it was between separate shifts. *Bridges*, 54 F.4th at 708.

Ultimately, *Bridges* confirms the continuous workday rule applies to federal workers, and its narrow holding would not preclude applying the continuous workday rule to the facts alleged in the instant matter.

> **2.**    ***Alvarez*'s interpretation of continuous workday generally applies to federal employees and plausibly covers Plaintiffs' walk through a sally port.**

Given that federal workers are not categorically excluded from the continuous workday rule, the next questions are what definition of "continuous workday" to apply and whether Plaintiffs' walk through a sally port plausibly fits within that definition. *Bridges* is explicit that a "continuous workday" is "defined by Congress, OPM, and the Supreme Court" as "the start and stop of 'principal activities.'" *Bridges*, 54 F.4th at 707 (first citing 29 U.S.C. § 254(a); then citing 5 C.F.R. § 551.411(a); and then citing *Alvarez*, 546 U.S. at 37).

This Court is bound by the definition of continuous workday from *Bridges* and *Alvarez*. "The precedent of the Supreme Court and the Federal Circuit is binding upon the [Court of Federal Claims]." *Garner v. United States*, 85 Fed. Cl. 756, 759 (2009) (citing *Coltec Indus. v. United States*, 454 F.3d 1340, 1353 (Fed. Cir. 2006)). And "binding precedent includes the manner in which the Supreme Court and the Federal Circuit interpret statutes and administrative regulations." *Id*. (citing *Passamaquoddy Tribe v. United States*, 82 Fed. Cl. 256, 261–62 (2008)). Therefore, instead of conducting a de novo interpretation of Section 551.412(b)'s text, this Court must look to *Alvarez*'s interpretation of the FLSA to determine whether Plaintiffs' walk can fit within a continuous workday.

The ruling in *Alvarez* squarely applies to the instant facts: walking between the area where equipment is donned or doffed and the location of the shift is compensable during a continuous workday. 546 U.S. at 37. The Court considered whether meat production workers could recover for their time walking from a locker room, where they donned safety equipment, to the plant's production floor. *Id.* at 31. It held "during a continuous workday, any walking time that occurs after the beginning of the employee's first principal activity and before the end of the

employee's last principal activity is excluded from the scope of [Section 4(a) of the Portal-to-Portal Act], and as a result is covered by the FLSA." *Id*. at 37.

In a single parenthetical, the Government dismisses the relevance of *Alvarez*, describing it as a "FLSA matter between two private parties not involving the Federal government [and thus] applying Title 29 Department of Labor regulations." Reply at 14. This ignores *Bridges*, which directly adopts *Alvarez*'s interpretation of "continuous workday" for federal employees: "OPM and the Supreme Court follow the same definition [of 'continuous workday']." 54 F.4th at 707 n.5 (first citing 5 C.F.R. § 551.411(a); and then citing *Alvarez*, 546 U.S. at 37).

Furthermore, *Alvarez*'s ruling is rooted in the FLSA's text, not just DOL regulations. In a section discussing the FLSA titled "Text"—as in, statutory text of the FLSA—the Court wrote that "[w]alking to [the locker room] before starting work is excluded from FLSA coverage, but the *statutory text* does not exclude walking from that place to another area within the plant immediately after the workday has commenced." *Alvarez*, 546 U.S. at 34 (emphasis added).

Defendant grounds its argument in the OPM regulatory text and case law of other Court of Federal Claims rulings. It points out that "OPM regulations exclude time spent performing preliminary and postliminary activities from compensable hours of work 'even if it occurs between periods of activity that are compensable as hours of work.'" Reply at 14 (quoting 5 C.F.R. § 551.412(b)). "Therefore," Defendant reasons, "under [Section 551.412(b)], time spent in a sally port is not compensable even if a compensable activity precedes it." *Id*. (citing *Alkire*, 158 Fed. Cl. at 396).

But this Court cannot ignore *Alvarez*—or its adoption by *Bridges*—and proceed straight to a de novo reading of the regulatory text. *See Garner*, 85 Fed. Cl. at 759 (citation omitted). Defendant is correct that Section 551.412(b) excludes "[t]ime spent in preliminary or postliminary activities," even if it occurs between compensable work. 5 C.F.R. § 551.412(b). Under Defendant's interpretation of Section 551.412(b), walking is one such "preliminary" or "postliminary" activity that must be excluded from compensation. This may be one rational interpretation of the regulation, but it is not the binding one. The Federal Circuit ruled OPM uses the same definition of "continuous workday" as the Supreme Court in *Alvarez*. *Bridges*, 54 F.4th at 707 n.5 (citations omitted). And the Supreme Court ruled the time workers spend walking between the room where they don and doff equipment and the place where their shift officially starts and ends is compensable as a continuous workday. *Alvarez*, 546 U.S. at 34, 37. Therefore, binding authority commands the conclusion that the noncompensable preliminary and postliminary activities discussed in Section 551.412(b) do not include walking to or from an equipment room at the start or end of a shift.

### 3. To the extent OPM regulations deny compensation for walking between principal activities within the same job site, they are inconsistent with the FLSA.

*Bridges* requires this court to read Section 551.412(b) in harmony with *Alvarez*. *See* 54 F.4th at 707–08. To the extent that the regulation contradicts the continuous workday holding in *Alvarez*, it is invalid. *See Archuleta v. Hopper*, 786 F.3d 1340, 1351 n.5 (Fed. Cir. 2015)

(determining certain OPM regulations were invalid to the extent they were inconsistent with an agency's statutory obligations).

"OPM regulations are valid if they are consistent with the FLSA and implement a legitimate policy choice." *Doe No. 1*, 129 F.4th at 1366. Excluding Plaintiffs' walk is inconsistent with the Supreme Court's interpretation of the FLSA in *Alvarez*. The Supreme Court reached two conclusions relevant to the instant case: (1) an "integral and indispensable" activity like donning or doffing equipment is a principal activity that commences the workday, and (2) "the statutory text does not exclude walking from [the equipment room] to another area within the plant immediately after the workday has commenced." *Alvarez*, 546 U.S. at 34, 37. This Court is bound by this interpretation. *See Garner*, 85 Fed. Cl. at 759 (citation omitted). If Section 551.412(b) cannot be squared with that interpretation, it would be invalid. *See Doe No. 1*, 129 F.4th at 1366; *see also FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32 (1981) ("[T]he courts are the final authorities on issues of statutory construction. They must reject administrative constructions of [a] statute . . . that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement.").

Thus, Plaintiffs' argument that sally-port travel time can be compensated as part of an officer's "continuous workday" remains plausible under Section 551.412(b) and the FLSA.

## IV.    Conclusion

Defendant fails to show Plaintiffs' allegations of the compensability of security screening and sally-port passing time are devoid of plausibility or fail as a matter of law. "The Government's motion may succeed at summary judgment when facts are established through discovery. But that does not mean it can prevail now [at the motion to dismiss stage]." *Baytos I*, 2022 WL 598742, at *13. Defendant's Partial Motion to Dismiss is **DENIED**. Defendant **MUST** file an Answer by April 15, 2026. The parties **MUST** file a Joint Preliminary Status Report in alignment with the Court's Standing Order, ECF No. 17, by May 18, 2026.

Plaintiffs' March 16, 2026 Motion for Leave to File Notice of Supplemental Authority, ECF No. 18, is **GRANTED** and accepted for filing.


        **IT IS SO ORDERED.**



                                 s/ Carolyn N. Lerner
                                CAROLYN N. LERNER
                                Judge